******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# JANET BRENNAN, EXECUTRIX (ESTATE OF THOMAS BRENNAN) *v.* CITY OF WATERBURY
## (SC 19937)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.*

*Syllabus*

The substitute plaintiff, J, the executrix of the estate of T, her husband, appealed from the decision of the Compensation Review Board, which concluded, inter alia, that she was improperly substituted as the claimant because a claimant's estate cannot receive the claimant's vested but unpaid statutory (§ 7-433c) heart and hypertension benefits. T, who had been the fire chief for the defendant city of Waterbury, suffered a heart attack in 1991 during the course of his employment and filed a claim for heart and hypertension benefits. In 1993, the workers' compensation commissioner, having accepted the parties' stipulation that T had been diagnosed with hypertension and heart disease after his heart attack and that no evidence of such disease had been present prior to T's employment, issued a finding and award, in which the city was ordered to pay T all of the benefits to which he "is or may become entitled." The city and T thereafter negotiated in an attempt to reach an agreement on the payment of benefits, during which time T elected to take disability retirement. The city made certain payments to T pursuant to § 7-433c, but the city and T never entered into a full and final settlement of his claim for heart and hypertension benefits, and T died in 2006. In 2013, T's attorney sought to finalize T's permanent partial disability claim under § 7-433c and moved to substitute J, both in her capacity as executrix of T's estate and in her individual capacity, as claimants. The commissioner granted the motion insofar as J sought to be substituted as a claimant in her capacity as executrix of T's estate but denied the motion to substitute J in her individual capacity. The city appealed to the board from that decision, claiming, inter alia, that, pursuant to *Morgan* v. *East Haven* (208 Conn. 576), the estate was not a legally qualified recipient of heart and hypertension benefits. Subsequently, in 2015, the commissioner issued a finding and decision, in which it ordered the city to pay J, in her capacity as executrix of T's estate, benefits for 80 percent permanent partial disability of T's heart pursuant to § 7-433c and the corresponding statutory provision (§ 31-308 [b]) of the Workers' Compensation Act, less any advance payments that had already been made. The city filed a separate appeal with the board from the commissioner's finding and decision, and the board consolidated the city's appeals. The board concluded that an estate was not a qualified recipient of vested but unpaid heart and hypertension benefits, vacated the decision making the estate the beneficiary, and remanded the case to the commissioner to decide the proper recipient of the benefits. The board, however, upheld the commissioner's central findings and ordered the commissioner, in addressing on remand the issue of the proper beneficiary, to address several issues that the city previously raised with respect to the availability and amount of benefits but that the commissioner had declined to address. On appeal from the board's decision, J, in her capacity as executrix, claims, inter alia, that T's disability benefits matured because the right to those benefits vested once the decedent reached maximum medical improvement in 1993, and, if the city had timely paid those benefits starting from that date, all compensation would have been paid to T before his death. The city claims that any benefits that it might be obligated to pay as a result of T's permanent disability had not matured, as they were not payable to him during his lifetime because his disability rating had not been conclusively established until after his death and he chose to negotiate for a lump sum payment during his lifetime rather than to obtain a final adjudication of the exact weekly compensation that the city would be obligated to pay. *Held*:

1. The city could not prevail on its claim that the appeal must be dismissed

for lack of standing because it was filed by J in her individual capacity, as she was neither a party to the proceedings or aggrieved by the board's decision; although the appeal form reflected that J was the party filing the appeal, that entry did not indicate whether J filed the appeal in her representative or individual capacity, and this court resolved that ambiguity by reference to other filings, including the docketing statement, the name of the case on the appeal form, and J's brief, all of which indicated that the appeal was filed on behalf of J in her capacity as executrix of T's estate.

2. This court concluded that heart and hypertension benefits under § 7-433c may be paid to a claimant's estate if such unpaid benefits matured before the claimant's death, and, accordingly, the board's decision was reversed insofar as the board concluded that the commissioner improperly had granted the motion to substitute J in her capacity as executrix of T's estate as the claimant: contrary to the city's claim, the holding in *Morgan* was limited to the distribution of unmatured heart and hypertension benefits, which pass to dependents rather than to a claimant's estate, and there was nothing in *Morgan* that precluded this court from treating unpaid, matured heart and hypertension benefits in the same manner as unpaid, matured workers' compensation benefits, which traditionally have belonged to a claimant's estate; moreover, the legislature's response to *Morgan*, which added a provision to § 7-433c that recognized a deceased employee's nondependent children as potential beneficiaries of unmatured benefits, did not serve to eliminate an employee's existing right to have his unpaid matured benefits pass to his estate but, rather, was intended to provide a new right by expanding the class of potential beneficiaries of unmatured benefits, the legislative history having clearly indicated an intent on the part of the legislature to apply the same rules of distribution for heart and hypertension benefits and workers' compensation benefits.

3. This court could not conclude, on the basis of the record before it, that the unpaid portion of T's benefits under § 7-433c for his 80 percent impairment to his heart function matured before his death, and the case was remanded to the commissioner to make additional findings in connection with this issue; this court determined that permanent disability benefits under § 7-433c mature only after the degree of permanent impairment has been established by an award or an agreement between the parties sufficient to establish a binding meeting of the minds, and consideration of the 1993 finding and award, the commissioner's 2015 finding and decision, as well as the absence of the parties' submission to the commissioner of a voluntary agreement regarding the degree of permanency for approval during T's lifetime, led this court to conclude that the record not only failed to establish that, prior to T's death, there was a meeting of the minds regarding the permanency of T's disability but that there was a clear implication to the contrary.

Argued September 10, 2018—officially released May 14, 2019

*Procedural History*

Consolidated appeals from the decisions of the Workers' Compensation Commissioner for the Fourth District granting the motion to substitute the claimant filed by Janet Brennan, executrix of the estate of Thomas Brennan, and awarding permanent partial disability benefits to the substitute plaintiff, brought to the Compensation Review Board, which reversed the commissioner's decisions and remanded the case for further proceedings, and the substitute plaintiff appealed. *Affirmed in part; reversed in part; decision directed in part; further proceedings.*

*Richard O. LaBrecque*, with whom were *Francis J. Grady* and, on the brief, *Marina L. Green*, for the appellant (substitute plaintiff).

*Daniel J. Foster*, with whom, on the brief, was *Linda T. Wihbey*, for the appellee (defendant).

*Opinion*

McDONALD, J. In this appeal, we consider whether heart and hypertension benefits under General Statutes § 7-433c for permanent disability properly are paid to a deceased claimant's estate if such benefits vested and were payable ("matured") during the claimant's lifetime but were not paid to the claimant before his death. In particular, we are asked to consider whether *Morgan* v. *East Haven*, 208 Conn. 576, 546 A.2d 243 (1988), and the legislative response to that decision, instead requires payment of such benefits to the claimant's dependents or nondependent children.

The plaintiff, Janet Brennan, executrix of the estate of Thomas Brennan (executrix), appeals from the decision of the Compensation Review Board concluding that the executrix improperly was substituted as party claimant because a claimant's estate cannot receive the claimant's vested but unpaid § 7-433c benefits. We hold that neither *Morgan* nor any other legal authority barred the substitution to the extent that the executrix sought payment of matured benefits. We conclude, however, that, on the record before this court, we cannot determine that the permanent disability benefits matured prior to the death of Thomas Brennan (decedent). Accordingly, we reverse the board's decision only as to its determination that the decision of the Workers' Compensation Commissioner for the Fourth District (commissioner) to grant the motion to substitute the executrix as a party claimant was improper, but we affirm the decision in all other respects.

The record reveals the following undisputed facts and procedural history. In 1991, the decedent was employed by the defendant, the city of Waterbury (city), as its fire chief. During all relevant times, Janet Brennan[1] was married to the decedent. After the decedent suffered a heart attack during the course of his employment in July, 1993, he promptly filed a claim for § 7-433c benefits. The Workers' Compensation Commissioner for the Fifth District thereafter accepted the parties' stipulation of facts, wherein they agreed that the decedent had been diagnosed with hypertension and heart disease after his heart attack and that no evidence of such disease had been present prior to the decedent's employment as fire chief.[2] In December, 1993, the fifth district commissioner issued a finding and award, which ordered the city to pay the decedent all of the benefits of § 7-433c to which he "is or may become entitled."

For several years after issuance of the 1993 finding and award, the decedent and the city attempted to reach an agreement on the payment of benefits.[3] While negotiations were ongoing, the decedent elected to take disability retirement in December, 1995. In connection with the disability pension hearing and the pending

§ 7-433c claim, the city obtained opinions from three medical experts assessing the extent of the decedent's disability. Two of those experts rated the permanent impairment relating to his heart condition at 50 percent, and the other expert rated it at 75 percent. The decedent obtained an opinion from his own physician, who assessed the permanent impairment at 80 percent. The city's retirement board authorized a disability pension.[4]

Thereafter, the city also made certain payments to the decedent pursuant to § 7-433c. In July, 1997, the city paid the decedent a lump sum, which the accompanying letter from the city's risk manager explained as "representing 115.4 weeks [of permanent partial disability benefits] from the [maximum medical improvement] date of [October 13, 1993] to [the decedent's] retirement date of [December 21, 1995] at his maximum [permanent partial disability] rate . . . . We can use this amount as an advance if a final settlement can be reached. In the event that one is not obtainable at this time, the balance of [the decedent's permanent partial disability] would be calculated pursuant to [the statutory cap under General Statutes §] 7-433b."[5] In June, 1999, the city paid the decedent an additional lump sum, which represented a "52 weeks advance [of permanent partial disability that was] calculated pursuant to [the statutory cap under §] 7-433b and utilized a counterpart's pay . . . ."

The city and the decedent, however, never entered into a full and final settlement of the heart and hypertension claim. The failure to do so may have been due to the city's ongoing financial difficulties, which, in 2001, resulted in the appointment of an oversight board to review and control the city's financial affairs. See Public Acts, Spec. Sess., June, 2001, No. 01-1.

In 2003, due to his deteriorating health, the decedent sought temporary total incapacity benefits. The city paid the decedent total incapacity benefits from February 19, 2003, until the decedent's death on April 20, 2006.[6]

It was not until 2013 that the decedent's attorney sought to finalize the decedent's permanent partial disability claim under § 7-433c. In connection with those proceedings, the decedent's treating physician, who had assigned an 80 percent disability rating in 1995, issued a postmortem opinion that the decedent's permanent disability rating should be increased to 90 percent. Subsequently, the decedent's attorney moved to substitute Brennan in her capacity as executrix of the decedent's estate and Brennan in her individual capacity as party claimants.[7]

The city objected to the substitutions, advancing two independent grounds with respect to the estate. First, it contended that Brennan, the decedent's sole heir and the beneficiary of a spousal pension, was improperly

seeking to circumvent the city charter's pension offset, which would negate any § 7-433c benefits otherwise due to her. Second, it contended that, pursuant to *Morgan* v. *East Haven*, supra, 208 Conn. 576, the estate was not a legally qualified recipient of funds paid under § 7-433c. In reply, the decedent's counsel contended that the substitution was proper because the benefits had vested and matured during the decedent's lifetime and, as such, would pass to his estate. The commissioner granted the motion insofar as it permitted the estate to be substituted as a party, but he denied the motion as to Brennan individually. The commissioner cited General Statutes § 52-599 (b), which provides for the survival of actions and the continuation of actions by a decedent's executor, as authority for the substitution. The city filed an appeal from the decision granting the estate's substitution. While that appeal was pending, proceedings continued on the benefits claim.

In December, 2015, the commissioner issued a finding and decision, ordering the city to pay benefits for 80 percent permanent partial disability of the decedent's heart pursuant to General Statutes §§ 7-433c and 31-308 (b), less any advance payments made to date on permanent partial disability. In support of this decision, the commissioner found that the decedent had reached maximum medical improvement on October 13, 1993, and credited the 1995 opinion of the decedent's physician assigning the 80 percent permanency rating to the decedent's disability. The commissioner declined to credit the lesser ratings of the city's three medical experts or the greater postmortem rating of the decedent's physician. The commissioner concluded that the decedent's entitlement to permanent partial disability benefits had vested prior to his death. The commissioner specifically concluded, however, that benefits were "due and payable to Janet Brennan and not the estate of [the decedent] . . . ."

Both parties filed motions to correct and for an articulation. The commissioner denied the city's motions but granted the executrix' motions in part. Specifically, the executrix sought (1) an articulation as to the dates on which the decedent's entitlement to disability benefits "vested *and matured*"; (emphasis added); and (2) a correction making the disability benefits payable to the estate or, alternatively, an articulation as to why the benefits are properly payable to Brennan individually. In response, the commissioner issued the following correction: "[Permanent partial disability] benefits vested as of the date of [maximum medical improvement] on October 13, 1993. [Permanent partial disability] benefits of 80 [percent] of the heart are payable to Janet Brennan, [e]xecutrix of the [e]state of [the decedent]." The city filed an appeal from the corrected finding and decision.

At the city's request, the board consolidated the

appeal contesting the estate's substitution with the appeal contesting the corrected finding and decision. The board concluded that the case was controlled by *Morgan* v. *East Haven*, supra, 208 Conn. 576, which the board interpreted to hold that an estate is not a qualified recipient of vested but unpaid § 7-433c benefits. In reliance on *Morgan*, the board vacated the commissioner's decision granting the motion to substitute the executrix, vacated the corrected decision making the estate the beneficiary, and remanded the case to the commissioner to decide the proper recipient of the benefits. As to the benefits owed to any such recipient, the board affirmed the central findings of the commissioner's decision. However, the board ordered the commissioner, when considering on remand the proper beneficiary, also to address several issues previously raised by the city relating to the availability and amount of benefits that the commissioner had declined to address.[8] This appeal followed.[9]

I

Before turning to the executrix' challenges to the board's decision, we must dispose of a jurisdictional issue raised by the city. See, e.g., *Soracco* v. *Williams Scotsman, Inc.*, 292 Conn. 86, 90–91, 971 A.2d 1 (2009). Specifically, the city contends that this appeal must be dismissed because it was filed by Brennan individually, who lacks standing to appeal as she neither was a party to the proceedings below nor is aggrieved by the board's decision. We disagree.

The city's jurisdictional claim rests on the fact that the appeal form reflects that "Janet Brennan" is identified as the party filing the appeal. However, this entry does not indicate whether Brennan filed the appeal in her representative or individual capacity. This court has explained that "the forms for appeals and amended appeals do not in any way implicate appellate subject matter jurisdiction. They are merely the formal, technical vehicles by which parties seek to invoke that jurisdiction. Compliance with them need not be perfect; *it is the substance that matters, not the form.*" (Emphasis added.) *Pritchard* v. *Pritchard*, 281 Conn. 262, 275, 914 A.2d 1025 (2007). When there is an ambiguity as to the identity of the appellant, this court will look to other filings to resolve that ambiguity. See, e.g., *Celentano* v. *Rocque*, 282 Conn. 645, 647 n.1, 923 A.2d 709 (2007). The docketing statement, the name of the case cited on the appeal form, and the appellant's brief indicate that the appellant's intention was that the appeal was filed on behalf of "Janet Brennan, Executrix of the Estate of Thomas Brennan." Although these documents also refer to Brennan individually, the aforementioned references are sufficient to dispel any ambiguity as to whether a proper party has filed the appeal. See, e.g., id. (referring to briefs and docketing statement to discern proper identity of parties to appeal). Accordingly, we

reject the city's request for dismissal of the appeal.

## II

We now turn to the merits of the appeal. The executrix contends that the estate is the proper recipient of any unpaid permanent partial disability benefits owed by the city because those benefits matured during the decedent's lifetime. Had they been paid when due, according to the executrix, the entirety of the decedent's benefits would have been paid during his lifetime. The executrix further contends that *Morgan* v. *East Haven*, supra, 208 Conn. 576, on which the board relied, presents no legal impediment to awarding benefits to a claimant's estate because certain statutory language on which the case relied was repealed. Should this court conclude that *Morgan* was not implicitly legislatively overruled, she contends that *Morgan* should be either limited to its facts, which involved unmatured benefits, or overruled if applicable to vested, matured benefits.

The city disagrees with the executrix' characterization of the benefits as matured. It also defends the vitality and applicability of *Morgan*, and contends that awarding unpaid benefits to an estate would undermine legislative intent to provide compensation only to dependents.

We conclude that § 7-433c benefits properly may be paid to a claimant's estate, if such benefits matured before the claimant's death. However, we disagree that the record establishes that the disability benefits at issue in the present case matured prior to the decedent's death.

## A

In considering whether an estate can be a proper recipient of § 7-433c benefits, we apply the well settled standard of review applicable to administrative appeals. "Cases that present pure questions of law . . . invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion." (Internal quotation marks omitted.) *Estate of Rock* v. *University of Connecticut*, 323 Conn. 26, 30, 144 A.3d 420 (2016). "[W]e do not defer to the [agency's] construction of a statute—a question of law—when . . . the [provisions] at issue previously have not been subjected to judicial scrutiny or when the [agency's] interpretation has not been time tested." (Internal quotation marks omitted.) *Christopher R.* v. *Commissioner of Mental Retardation*, 277 Conn. 594, 603, 893 A.2d 431 (2006).

The present case does not involve a time tested agency interpretation. Moreover, although § 7-433c was subject to prior judicial scrutiny in *Morgan*, the present case requires us to determine the scope of our holding in that case, as well as the effect of subsequent legislative action. We therefore apply plenary review and estab-

lished rules of construction. See General Statutes § 1-2z; *Williams* v. *Commission on Human Rights & Opportunities*, 257 Conn. 258, 270, 777 A.2d 645 (2001).

Section 7-433c (a) provides in relevant part: "[A] uniformed member of a paid municipal fire department or a regular member of a paid municipal police department who . . . suffers . . . any condition or impairment of health caused by hypertension or heart disease resulting in his death or his temporary or permanent, total or partial disability, he or his dependents, as the case may be, shall receive from his municipal employer compensation . . . in the same amount and the same manner as that provided under chapter 568 [the Workers' Compensation Act, General Statutes § 31-275 et seq.] . . . ." Therefore, § 7-433c prescribes the conditions under which benefits are provided for this class of employees and their dependents, but the Workers' Compensation Act dictates the substance of and the procedure for obtaining such benefits. See *Ciarlelli* v. *Hamden*, 299 Conn. 265, 276–77, 8 A.3d 1093 (2010); *Genesky* v. *East Lyme*, 275 Conn. 246, 252 n.9, 881 A.2d 114 (2005).

Because of this relationship, we must consider the substantive law governing the postmortem distribution of workers' compensation disability benefits at the time that § 7-433c was enacted.[10] Like § 7-433c, for many years, the Workers' Compensation Act had no provision addressing the distribution of compensation owed to a claimant but not paid prior to the claimant's death. Drawing on the purpose of the act and various provisions, this court filled that gap.

Since the earliest days of our workers' compensation law, compensation owed to a claimant but not paid before his death was distributed according to whether the benefit "accrued" or "matured"[11] during the claimant's lifetime. The established rule was that " '[w]hatever of compensation accrues in [the claimant's] lifetime and is unpaid becomes upon his decease an asset of his estate.' *Jackson* v. *Berlin Construction Co.*, 93 Conn. 155, 157, 105 A. 326 (1918)." *Greenwood* v. *Luby*, 105 Conn. 398, 400, 135 A. 578 (1926); accord *Finkelstone* v. *Bridgeport Brass Co.*, 144 Conn. 470, 472, 134 A.2d 74 (1957) (estate of deceased employee has "a right in or to an award . . . when a portion of the compensation awarded or to be awarded the injured employee has accrued during his lifetime and remains unpaid at his death"); *Morganelli* v. *Derby*, 105 Conn. 545, 546, 135 A. 911 (1927) ("all [workers'] compensation accrued and matured during [the employee's] lifetime would belong to his estate"); see also 7 A. Larson, Larson's Workers' Compensation Law (2018) § 89.02 ("[a]ccrued but unpaid installments are, of course, an asset of the estate, like any other debt").

This rule applied both to temporary incapacity benefits, also known as "special" benefits, which continue only as long as there is an impairment of wage earning

power, and to permanent disability benefits, also known as "specific" benefits, which are provided for a fixed period in relation to the degree of impairment of a body part. See *Forkas* v. *International Silver Co.*, 100 Conn. 417, 420–21, 123 A. 831 (1924) (distinguishing benefits).

In a seminal 1926 case involving permanent disability benefits, this court clarified that the act indicated an "intention to confine the employee's interest to such part of the award as has accrued within his lifetime, and as to such portion of the award as did not mature in the employee's lifetime there is no survivorship in his estate." *Bassett* v. *Stratford Lumber Co.*, 105 Conn. 297, 301, 135 A. 574 (1926); id., 305 (overruling in part *Forkas* v. *International Silver Co.*, supra, 100 Conn. 417, insofar as that case held that unmatured part of award also belonged to claimant's estate). The court reasoned that "the employee has no vested right to the unmatured compensation awarded, and hence it cannot pass to his personal representatives." *Bassett* v. *Stratford Lumber Co.*, supra, 300. Accordingly, it held that, "[i]n case of death the dependents alone have the right to the *unmatured* part of the award of compensation . . . ." (Emphasis added.) Id., 303–304.

It was against this backdrop that this court decided *Morgan* v. *East Haven*, supra, 208 Conn. 576, on which the board relied in the present case. In *Morgan*, the commissioner issued an award to the claimant for 585 weeks of permanent partial disability benefits under §§ 7-433c and 31-308. Id., 579. The claimant received benefits until his death, and, thereafter, his surviving spouse received benefits until her death, at which point 233 of the 585 weeks of benefits awarded had been paid. Id. When the claimant's wife died, there were two surviving adult children but no dependents. Id. The fiduciaries of the estates of the claimant and his wife applied for an execution upon the remaining benefits in order to pass those benefits to the claimant's adult children. Id. It was clear that these remaining benefits had not matured before the recipients' deaths because they were not yet due to be paid. Accordingly, the issue raised to this court was whether the original award made pursuant to § 7-433c, in its entirety, was an asset of the deceased recipients' estates. Id., 577–78. The fiduciaries contended that the benefits vested in the recipients because the award was for "specific" benefits, and, consequently, the right to such benefits passed as a liquidated sum to the estates. Id., 583–84.

The court rejected that claim. Id., 584–86. It cited the text of § 7-433c, which referred exclusively to the employee or that person's dependents, and concluded that " 'dependents' " could not be construed to include the estate of the recipient. Id., 582–83. It was in relation to the construction of that term that the court held that "the clear and unambiguous language of the statute requires a municipal employer to provide compensation

only to police and fire personnel who suffer from hypertension and heart disease and their dependents, not to the estates of the deceased recipients." Id., 583.

Nonetheless, the court in *Morgan* went on to explain why the estates would not be entitled to the unpaid portion of the award under the theory advanced by the fiduciaries. Id. It rejected the proposition that the unpaid § 7-433c benefits had vested in the recipients because they were "specific" benefits, like permanent disability benefits under § 31-308. Id., 583–85. The court reasoned that disability benefits payable under § 7-433c are more akin to "special" benefits (compensating for incapacity to work) than to specific benefits because the preamble to § 7-433c then in effect provided "that the section was designed to protect against '*economic loss* resulting from disability.' " (Emphasis in original.) Id., 585; see General Statutes (Rev. to 1985) § 7-433c. The court then reasoned that, "[t]o conclude, as the plaintiffs contend, that the estate of a deceased recipient, who leaves no dependents under § 7-433c, is entitled to the sum of *unmatured* weekly payments carries the concept of 'economic loss' . . . beyond the legislative purpose in enacting that statute." (Emphasis added.) Id., 586.

The court further explained that, even if § 7-433c benefits could be viewed as akin to "specific" benefits, the estate still would not be entitled to the benefits. Id., 587. The court pointed to *Bassett* v. *Stratford Lumber Co.*, supra, 105 Conn. 305, "in which case we specifically held that any *unmatured* part of a weekly compensation scheme does not succeed to the estate of the employee."[12] (Emphasis added.) *Morgan* v. *East Haven*, supra, 208 Conn. 587. Notably, the court in *Morgan* went on to observe that there could have been a scenario under which the unpaid benefits properly would have been distributed to the recipients' estates. Observing that forty-six weeks of benefits had been commuted and paid in a lump sum to the claimant, the court opined: "Had the commuted payment been outstanding at the time of [the death of the claimant's wife], *there is little dispute that the outstanding balance of the commuted amount would be due and payable to the estate. At the time of commutation, that portion of compensation that was commuted became mature and, thus, immediately due and owing.*" (Emphasis added.) Id.

The foregoing discussion makes clear that the holding in *Morgan* was limited to the distribution of unmatured § 7-433c benefits, which pass to "dependents." In the present case, the executrix does not contend that the estate is entitled to unmatured benefits. Rather, her claim is that matured § 7-433c benefits due to a police or fire department employee pass to a claimant's estate. In other words, the executrix is contending that matured § 7-433c benefits would be treated in the same

manner as matured workers' compensation benefits long have been treated.

We see nothing in *Morgan* to preclude the application of this workers' compensation principle to § 7-433c. See *King* v. *Sultar*, 253 Conn. 429, 448, 754 A.2d 782 (2000) ("*Morgan* does not stand for the proposition that § 7-433c benefits are never to be considered workers' compensation benefits"); see also, e.g., id., 433–34, 437–48 (treating § 7-433c benefits as workers' compensation benefits for purposes of allowing city to intervene as coplaintiff in recipient's medical negligence action in order to recover sums paid and obligated to be paid under § 7-433c); *Maciejewski* v. *West Hartford*, 194 Conn. 139, 150–51, 480 A.2d 519 (1984) (treating § 7-433c benefits as workers' compensation payments for purposes of establishing municipal pension benefits). Although *Morgan* recognized certain material distinctions between § 7-433c benefits and workers' compensation benefits, in that the former provides economic benefits under less stringent conditions than the latter; *Morgan* v. *East Haven*, supra, 208 Conn. 581; it also recognized that workers' compensation principles would have applied if the benefits had matured. Id., 587. Insofar as *Morgan* characterized § 7-433c benefits as more akin to "special" (i.e., incapacity) benefits under workers' compensation law; id., 586; our case law holds that matured incapacity benefits also pass to the claimant's estate.[13] See *Greenwood* v. *Luby*, supra, 105 Conn. 401–402; *Jackson* v. *Berlin Construction Co.*, supra, 93 Conn. 157. Therefore, we disagree with the board that *Morgan* prescribed a broad rule that an estate can never be a proper recipient of § 7-433c benefits.

We also see nothing in the legislature's response to *Morgan* that demonstrates an intent to overrule long settled precedent regarding matured but unpaid benefits. In 1989, the legislature enacted the following provision: "Any award for compensation made pursuant to this section shall be paid to the employee, or in the event of such employee's death, to his surviving spouse or, if he has no such spouse, to his dependents in equal shares *or, if he has no surviving spouse or dependents, to his children, in equal shares, regardless of their age.*" (Emphasis added.) Public Acts 1989, No. 89-346 (P.A. 89-346); see also Public Acts 1993, No. 93-228, § 19 (adding language to make provision applicable if compensation is based on agreement rather than award), codified at General Statutes § 31-308 (d). Although this provision does not refer to the employee's estate, it is important to remember that, for many decades, the payment of matured benefits to the employee's estate was considered a payment of the *employee's* vested interest. See *Finkelstone* v. *Bridgeport Brass Co.*, supra, 144 Conn. 472; *Bassett* v. *Stratford Lumber Co.*, supra, 105 Conn. 300–301. The only beneficiary added to § 31-308 (d) that had not previously

been recognized as a proper recipient of benefits is the employee's nondependent children. We therefore assume that this provision was not intended to take away employees' existing right to have their unpaid matured benefits pass to their estate but, rather, was intended to provide a new right by expanding the potential beneficiaries of unmatured benefits.

The legislative history of P.A. 89-346 confirms that the legislature did not intend to change the law except as necessary to rectify the holding in *Morgan* with respect to nondependent children. Explanations regarding the bill that became P.A. 89-346 indicate the legislature's intent to expand the existing class to whom *unmatured* benefits could pass to include nondependent children. See 32 H.R. Proc., Pt. 5, 1989 Sess., p. 1600, remarks of Representative Joseph A. Adamo (discussing bill as direct response to *Morgan*); 32 H.R. Proc., Pt. 17, 1989 Sess., pp. 5877–78, remarks of Representative Adamo (referring to "leftover" benefits); 32 S. Proc., Pt. 12, 1989 Sess., p. 3952, remarks of Senator James Maloney (referring to benefits that had not been "fully paid" out before worker died). Had the legislature intended to overrule seven decades of workers' compensation precedent, under which matured benefits passed to an employee's estate, presumably a sponsor of the legislation would have made this fact known to the legislators voting on it.[14]

While the legislative response to *Morgan* gives no indication of an intent to overrule precedent other than the specific holding of *Morgan*, the legislative history does provide a clear indication of an intent to apply the same rules of distribution for § 7-433c benefits and workers' compensation benefits. One legislator asked whether the new provision expanding the class of beneficiaries also would apply to benefits provided through § 7-433c, or would apply only to those provided through the act. See 32 H.R. Proc., Pt. 17, 1989 Sess., pp. 5882–83, remarks of Representative Robert M. Ward. The bill's sponsor made clear that both benefits would be treated the same. See 32 H.R. Proc., Pt. 17, 1989 Sess., p. 5883, remarks of Representative Adamo. Thus, to whatever extent the board deemed it significant that *Morgan* characterized these benefits differently, this legislative history confirms that any such difference would not bear on distribution.

Finally, with regard to the city's argument that providing benefits to a claimant's estate would contravene the legislature's intent not to benefit nondependents, this court long ago rejected this very argument: "The trial court based its decision [denying the claim of the claimant's estate] upon the theory that the intent of the [act] is to provide compensation to the workman and upon his decease to his dependents. And that, if the estate of the workman received the compensation for his incapacity which had accrued before his decease,

this would enrich his estate, and perhaps strangers, instead of benefiting his dependents, and so defeat a primary purpose of the act. This is an erroneous application of the true theory of our [act]. The compensation accrued before the workman deceased, his right to it had vested, hence it survived to his estate. Had he collected it, it would have been his in lieu of the wages which, but for his incapacity, he would have received. It is possible that the accrued compensation constituting this award may go to the relatives of the deceased workman who were not his dependents, but it is far more probable that it will help meet the expenses which his incapacity and his illness preceding his decease have entailed." *Greenwood* v. *Luby*, supra, 105 Conn. 401–402.

An interpretation of § 7-433c that allows matured benefits to pass to the estate rather than the claimant's dependents may better effectuate legislative intent. As the city emphasizes in the present case, § 7-433c benefits are subject to pension offsets and caps. The payment of matured benefits to the estate will allow for a more rational application of the pension offsets under § 7-433b. The estate stands in the shoes of the employee and receives no greater or lesser benefit than had the employee been paid during his lifetime. It is precisely because the employee was entitled to receive the benefits during his lifetime that entitles the estate to the benefits.

In sum, we conclude that matured § 7-433c benefits—those that accrued during the claimant's lifetime—properly pass to the claimant's estate. The question that remains for our consideration is whether the benefits at issue in the present case had matured before the decedent's death.[15]

### B

The executrix contends that the disability benefits matured because the right to those benefits vested once the decedent reached maximum medical improvement on October 13, 1993, and, had the city timely paid those benefits starting from that date, all compensation due would have been paid to the decedent before he began receiving temporary total disability benefits on February 19, 2003.[16] The executrix acknowledges that the decedent could have insisted on the payment of disability benefits. Nonetheless, she contends that, because of the city's economic distress and the decedent's desire for a lump sum payment to settle his entire claim, the decedent "did not pressure the city for weekly payments, but rather agreed to wait for the city to have enough money to settle the claim in full."

The city claims that any benefits that it might be obligated to pay as a result of the decedent's permanent disability had not matured because they were not payable to him during his lifetime. The city asserts that the

1993 award was not definite enough to impose on the city an obligation to begin payments to the decedent during his lifetime because (1) his disability rating was not conclusively established until after his death, and (2) he chose to negotiate for a lump sum payment during his lifetime rather than obtain a final adjudication of the exact weekly compensation that the city would be obligated to pay.

In response, the executrix contends that the amount of disability benefits due was certain, because the city and the decedent had reached a compromise disability rating of 77.5 percent in the course of their settlement negotiations. She further contends that, even if the statutory maximum (520 weeks of compensation) had been ordered, under any scenario, "[h]ad the city fulfilled its obligation to make weekly payments in light of its financial inability to settle the case, [the decedent's disability] benefits would have been paid in full [before his death]."

We conclude that, on the present record, we cannot state with certainty that the unpaid portion of the 80 percent permanent partial disability benefits necessarily matured before the decedent's death. Our uncertainty in this regard exists because the commissioner's decision does not include necessary findings on the critical issues, and we therefore leave open the possibility that the commissioner, on remand, may find that some portion of the benefits matured before the decedent's death.

"The conclusions drawn by [the commissioner] from the facts found must stand unless they result from an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them." (Internal quotation marks omitted.) *Balloli* v. *New Haven Police Dept.*, 324 Conn. 14, 17, 151 A.3d 367 (2016). Resolution of the matter first presents a legal question—under what conditions do benefits mature. It then requires application of that law to the facts found by the commissioner.

Turning to the legal question, we note that our case law reflects that permanent disability benefits vest, or become due, when the claimant reaches maximum medical improvement.[17] See, e.g., *Churchville* v. *Bruce R. Daly Mechanical Contractor*, 299 Conn. 185, 191, 8 A.3d 507 (2010); *McCurdy* v. *State*, 227 Conn. 261, 268, 630 A.2d 64 (1993); *Panico* v. *Sperry Engineering Co.*, 113 Conn. 707, 714, 156 A. 802 (1931), overruled in part on other grounds by *Osterlund* v. *State*, 129 Conn. 591, 597–600, 30 A.2d 393 (1943).

The significance of the date of maximum medical improvement, however, is twofold. The date of maximum medical improvement is the point at which the *permanency* of the condition and, hence, the *right* to permanent disability benefits, is established, and it is

also the point at which the *degree* of permanent impairment (loss of, or loss of use of a body part) can be assessed, which will determine the employer's payment obligations (i.e., number of weeks of compensation owed). An employer's payment obligations, then, are not fixed until the establishment of entitlement to permanent disability benefits. General Statutes § 31-295 (c) provides in relevant part: "*If the employee is entitled to receive compensation for permanent disability to an injured member in accordance with the provisions of subsection (b) of section 31-308*, the compensation shall be paid to him beginning not later than thirty days following the date of the maximum improvement of the member or members and, if the compensation payments are not so paid, the employer shall, in addition to the compensation rate, pay interest at the rate of ten per cent per annum on such sum or sums from the date of maximum improvement. . . ." (Emphasis added.) This court has recognized that the condition precedent, entitlement to this benefit, "depends on both the establishment of a permanent disability and the extent of that disability . . . ."[18] *Churchville* v. *Bruce R. Daly Mechanical Contractor*, supra, 299 Conn. 193; accord 1 A. Sevarino, Connecticut Workers' Compensation After Reforms (7th Ed. 2017) § 2.14.7, pp. 152–53 (explaining that, for § 31-295 to apply, "the worker must be 'entitled' to receive permanent partial impairment benefits," and benefits are not owed until degree of permanent impairment has been established by award or agreement); see also *Milewski* v. *Stratford*, No. 5483, CRB 4-09-7 (July 20, 2010) (discussing board precedent under which lack of definiteness as to material terms will impact employer's payment obligations and concluding that such material term was at issue in case at hand when disability rating had been substantially in dispute such that there was no meeting of minds); *Abrahamson* v. *Dept. of Public Works*, No. 5280, CRB 2-07-10 (February 26, 2009) (concluding that payment of interest pursuant to § 31-295 [c] is mandatory if conditions enumerated by provision are met, and that conditional language suggests "that the provision is implicated only after the issue of permanent partial disability is no longer the subject of litigation"); *Cappellino* v. *Cheshire*, 9 Conn. Workers' Comp. Rev. Op. 49, 50 (1991) (even though decedent reached maximum medical improvement on March 1, 1978, he was entitled to receive specific benefits "when the parties' [v]oluntary [a]greement for [30 percent] loss of use of the back was approved by the Fifth District July 3, 1978"). But see 1 A. Sevarino, supra, p. 152 (questioning whether payment obligations and penalties under § 31-295 [c] would apply based on oral agreement prior to issuance of actual voluntary agreement).

In light of this authority, we are compelled to conclude that permanent disability benefits mature only after the degree of permanency has been fixed by way

of an award or an agreement between the parties sufficient to establish a binding meeting of the minds. For the reasons set forth subsequently in this opinion, we cannot conclude on the present record that the degree of permanency was fixed prior to the decedent's death. However, because this issue was not addressed by the commissioner, and the case is being remanded to the commissioner for further proceedings, we leave open the possibility that the commissioner may conclude that some portion of the benefits matured during the decedent's lifetime.[19] See, e.g., *Russo* v. *Waterbury*, 304 Conn. 710, 734, 41 A.3d 1033 (2012) (concluding that case should be remanded to trial court for further proceedings due to lack of findings on facts essential to court's legal conclusion regarding application of offset to disability pension); *Deschenes* v. *Transco, Inc.*, 288 Conn. 303, 304–306, 953 A.2d 13 (2008) (concluding that case should be remanded to commissioner for further proceedings due to lack of findings on facts essential to commissioner's legal conclusion regarding apportionment of permanent partial disability benefits).

We begin our explanation for this conclusion with the 1993 award. The 1993 award itself does not provide the necessary findings. That award reflects that the decedent had established a compensable condition under § 7-433c by way of a diagnosis of hypertension and heart disease during the course of his employment. The award did not find, however, that maximum medical improvement had been reached; nor did it adopt a permanency rating. It simply ordered the city to pay the decedent all of the benefits of § 7-433c to which he "is or may become entitled."

No voluntary agreement containing these terms was submitted to the commissioner for approval during the decedent's lifetime. There is a draft settlement agreement in the record, apparently drafted by the decedent's counsel, with an accompanying motion to open and set aside the 1993 award. The city did not sign those documents. In his 2015 decision, the commissioner expressly found that the parties did not reach a final settlement.

In that decision, the commissioner found that the decedent reached maximum medical improvement on October 13, 1993. Although the commissioner made no express finding as to whether there was a meeting of the minds on that matter before the decedent's death, the evidence in the record plainly reveals that to be the case. In a July, 1997 letter, the city acknowledged that the decedent had a permanent impairment and had reached maximum medical improvement on October 13, 1993. But the degree of the permanency is not the subject of any finding or final agreement.

The record not only fails to establish that there was a meeting of the minds on the degree of permanency to be assigned to that disability, it provides a clear

implication to the contrary. The executrix relies on a provision in the draft settlement agreement adopting a "compromise" disability rating of 77.5 percent, but the city did not draft the agreement, it did not sign the motion seeking to submit that agreement to the commissioner, and it did not state in any of its communications to the decedent (in the record) that it had agreed to that rating. Had the commissioner found that there was a meeting of the minds on this matter, he either would have adopted this rating or explained why he had rejected it. However, the commissioner did neither, and in fact made no reference to the purported compromise rating. Most significantly, the commissioner duly considered, but ultimately found unpersuasive, the opinions of the city's medical experts assigning lesser ratings of 50 percent and 75 percent. The commissioner's consideration of those ratings, as well as the executrix' higher rating that the commissioner ultimately adopted, is inconsistent with a finding that there had been a meeting of the minds as to permanency.[20]

We acknowledge that an argument could be made that there was a meeting of the minds that there was a permanent impairment of *at least* 50 percent. Although the executrix did not advance this argument, we see no impediment to the commissioner's consideration of it after the case is remanded to the commissioner to resolve the open issues as to the proper beneficiary, benefit calculations, and setoffs. We note that this is an issue of first impression as to whether benefits could mature under such circumstance, and the board should be given an opportunity to weigh in on this matter should an appeal be necessary.

Similarly, we leave to the commissioner the executrix' argument that, in part because of the city's economic distress, the decedent "did not pressure the city for weekly payments, but rather agreed to wait for the city to have enough money to settle the claim in full." The commissioner made no findings relating to any such agreement or any such reliance argument. In the absence of such findings or clear evidence establishing such fact, the better course, in light of the pending remand, is to allow the commissioner, and the board if necessary, to consider this argument.

Accordingly, on the basis of the record before this court, we cannot conclude that the decedent's § 7-433c disability benefits for his 80 percent impairment to his heart function matured before his death. In accordance with the board's decision, the case will be remanded for further proceedings to decide the proper beneficiary of any benefits due.

The decision of the Compensation Review Board is reversed only as to its determination that the commissioner improperly granted the motion to substitute the executrix as a party claimant and the case is remanded to the board with direction to affirm the commissioner's

decision granting that motion and to remand the case to the commissioner for further proceedings to determine the proper beneficiary and the amount of benefits due; the decision is affirmed in all other respects.

In this opinion the other justices concurred.

* This case was originally scheduled to be argued before a panel of this court consisting of Chief Justice Robinson and Justices Palmer, McDonald, D'Auria, Mullins, Kahn and Ecker. Although Justice Kahn was not present when the case was argued before the court, she has read the briefs and appendices and listened to a recording of the oral argument prior to participating in this decision.

[1] We refer to Janet Brennan by name when addressing matters undertaken in her individual capacity and by her title as executrix when addressing matters undertaken in her capacity as fiduciary of the decedent's estate.

[2] For persons hired prior to July 1, 1996, § 7-433c "requires the payment of compensation to firemen and policemen who have successfully passed a physical examination which failed to reveal any evidence of hypertension or heart disease and who subsequently die or are disabled as a result of such conditions." *Plainville* v. *Travelers Indemnity Co.*, 178 Conn. 664, 670, 425 A.2d 131 (1979); see Public Acts 1996, No. 96-230, §§ 2 and 3, codified at § 7-433c (b) (rendering persons hired on or after July 1, 1996, ineligible for benefits under § 7-433c).

[3] Brennan testified that the decedent's goal in settling the claim was to obtain benefits in a lump sum in order to pay off a mortgage. In the unexecuted settlement agreement drafted by the decedent's attorney, which a cover letter explained was an effort to memorialize the agreed upon terms, the decedent would receive a lump sum of $400,000 in exchange for the waiver of his rights to pursue present and future claims arising from his condition, including a waiver of survivors' benefits.

[4] The retirement board authorized a 75 percent disability pension. The commissioner's subsequent decision did not reference that rating. See generally *Dzienkiewicz* v. *Dept. of Correction*, 291 Conn. 214, 217–18, 222–23, 967 A.2d 1183 (2009) (concluding that state medical examining board's decision awarding plaintiff disability retirement benefits was not binding evidentiary admission for purposes of workers' compensation proceeding and that commissioner did not abuse discretion in excluding it).

[5] Section 7-433b sets a cap on cumulative retirement benefits and disability benefits under § 7-433c.

[6] Several conditions were listed on the death certificate as the cause of death, including the decedent's heart condition. There was no claim advanced that the decedent's death was caused by factors that entitled his dependents to survivors' benefits under General Statutes §§ 7-433c and 31-306.

[7] The request to substitute Brennan individually apparently was for the purpose of seeking permanent disability benefits, in addition to those owed to the estate, on the basis of the postmortem opinion increasing the decedent's disability rating.

[8] Specifically, the commissioner deemed it unnecessary to address the extent to which the statutory cap under § 7-433b applied and whether a credit for temporary total incapacity benefits paid applied, and failed to set the amount of a weekly benefit and the number of weeks of unpaid disability benefits that the city was obligated to pay.

[9] The executrix appealed from the decision of the board to the Appellate Court pursuant to General Statutes § 31-301b, and we thereafter transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. We note that, despite the board's remand, this court has jurisdiction under § 31-301b, which provides that "[a]ny party aggrieved by the decision of the Compensation Review Board upon any question or questions of law arising in the proceedings may appeal the decision of the Compensation Review Board to the Appellate Court, whether or not the decision is a final decision within the meaning of section 4-183 or a final judgment within the meaning of section 52-263."

[10] See Public Acts 1971, No. 524, § 1 (repealing General Statutes § 7-433 and enacting § 7-433c); see also *Morgan* v. *East Haven*, supra, 208 Conn. 580–81 (describing predecessor heart and hypertension statutes).

[11] This court typically has used the terms "mature" and "accrue" interchangeably in this context to describe the time when an employee has an enforceable right to receive payment for workers' compensation benefits. See Black's Law Dictionary (6th Ed. 1990) p. 20 (accrue defined as "due

and payable; vested . . . matured"); see also Black's Law Dictionary (8th Ed. 2004) p. 22 (defining "accrue" as "[t]o come into existence as an enforceable claim or right; to arise").

[12] The court's reference to *Bassett* provides important context for its earlier statement that § 7-433c does not require an employer to provide compensation to the estates of the deceased recipients; see *Morgan* v. *East Haven*, supra, 208 Conn. 583; the statement on which the board apparently relied in the present case. In *Bassett*, the court made essentially the same statement; see *Bassett* v. *Stratford Lumber Co.*, supra, 105 Conn. 300, but also affirmed that an estate may receive benefits that matured prior to the claimant's death. See id., 301.

[13] Given that we do not find *Morgan*'s characterization of § 7-433c benefits as economic (i.e., "special") dispositive, we need not address the executrix' argument regarding the legislature's repeal of the "economic loss" language in § 7-433c on which *Morgan* relied for that characterization. See Public Acts 1996, No. 96-231.

[14] The only reference to any prior case law, other than *Morgan*, came from one legislator who opined that the proposed bill would overrule *Bassett* v. *Stratford Lumber Co.*, supra, 105 Conn. 297. See 32 H.R. Proc., Pt. 17, 1989 Sess., p. 5884, remarks of Representative Robert M. Ward. This statement was correct, insofar as *Bassett* held that an employee's estate could not receive *unmatured* benefits whereas P.A. 89-346 would allow the employee's legal heirs, nondependent children, to receive such benefits. Insofar as the legislature declined to adopt a more expansive version of the bill that became P.A. 89-346, which would have permitted unmatured benefits to be paid to the employee's estate, rather than only to his dependents and adult children; see 32 H.R. Proc., Pt. 5, 1989 Sess., pp. 1600–1601, remarks of Representative Adams; 32 H.R. Proc., Pt. 17, 1989 Sess., pp. 5874–82, remarks of Representative Adams; see generally *Flouton* v. *Can, Inc.*, No. 4379, CRB 7-01-4 (March 13, 2002); we are not persuaded that this rejection has any bearing on the distribution of matured benefits. We note that the fiscal analysis for the proposed legislation, provided to legislators, only accounted for the possibility of increased costs arising from expanding the class of beneficiaries. See Office of Legislative Research, Fiscal Impact Statement, Substitute House Bill 7181, An Act Concerning the Payment of Certain Workers' Compensation Benefits (1989). Had the legislation been intended to change the law to preclude the payment of matured benefits to an employee's estate, presumably that analysis also would have accounted for some cost savings from that change.

[15] The board did not address the executrix' claim that the benefits at issue had matured, presumably deeming that matter irrelevant in light of *Morgan*.

[16] "While we have held that the [act] prohibits concurrent payment of benefits for permanent partial disability and temporary total [incapacity] . . . it is clear that these two types of benefits compensate an employee for different types of loss . . . and that the payment of . . . § 31-307 temporary total [incapacity] benefits does not discharge the obligation to pay § 31-308 permanent partial disability benefits at some point in the future." (Citations omitted; internal quotation marks omitted.) *Churchville* v. *Bruce R. Daly Mechanical Contractor*, 299 Conn. 185, 193, 8 A.3d 507 (2010).

[17] We note that this court occasionally has stated that the benefits did not "accrue" because there had been no determination whether, or the date upon which, the claimant reached maximum medical improvement. See *Finkelstone* v. *Bridgeport Brass Co.*, supra, 144 Conn. 472 ("[n]o part of the compensation awarded or to be awarded for the decedent's partial loss of use of his left leg had accrued when he died, for it had not yet been determined that his leg had reached the state of maximum improvement"); *Panico* v. *Sperry Engineering Co.*, 113 Conn. 707, 716, 156 A. 802 (1931) ("[t]he record does not disclose at what date the condition of the plaintiff's arm reached the stage of ultimate improvement and when, in consequence, the period of compensation for incapacity would have terminated and the right to specific indemnity for proportionate loss of use accrued"), overruled in part on other grounds by *Osterlund* v. *State*, 129 Conn. 591, 597–600, 30 A.2d 393 (1943). We do not read these references to accrual to mean that the decedent's benefits would have matured if that date had been established irrespective of whether the degree of permanent disability had been established. Rather, we construe such references as equivalent to vesting, in that the right to such benefits would be established when the date is fixed. An unfortunate feature of our workers' compensation jurisprudence is a lack of consistency in terminology.

[18] Once the degree of permanency is established, benefits are owed retroac-

tive to the date of maximum medical improvement. See, e.g., *Marone* v. *Waterbury*, 244 Conn. 1, 4, 707 A.2d 725 (1998); *Rinaldi* v. *Enfield*, 82 Conn. App. 505, 508–509, 844 A.2d 949 (2004).

[19] Although the executrix specifically asked for the commissioner to correct the decision to indicate both the date on which the benefits vested and the date on which they matured, the commissioner made no correction to add a finding as to the latter.

[20] The commissioner's approach suggested that, even if the city had agreed to a compromise rating, it was not bound by that rating if the settlement was not finalized, and the city could have renegotiated a lower disability rating in exchange for reaching a full and final settlement after the oversight board was appointed.